**DETROIT, TOLEDO AND IRONTON RAILROAD COMPANY and Grand Trunk Western Railroad Company, Plaintiffs-Appellants,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant-Appellee.**

No. 84–1367.

United States Court of Appeals, Sixth Circuit.

Argued April 1, 1985.

Decided July 11, 1985.

John C. Danielson, argued, Fred L. Woodworth, Robert H. Gorlin, Jeffrey M. Kipshaw, Daniel J. Stephenson, Detroit, Mich., for plaintiffs-appellants.

Laurence Z. Shiekman, Philadelphia, Pa., Thomas E. Zemaitis, Nancy S. Katz, Detroit, Mich., Paul Cunningham, Robert Jenkins, III, argued, Pepper, Hamilton & Scheetz, Washington, D.C., Bruce B. Wilson, Constance L. Abrams, Cheryl A. Cook, Philadelphia, Pa., for defendant-appellee.

Before LIVELY, Chief Judge, JONES, Circuit Judge, and WEICK, Senior Circuit Judge.

LIVELY, Chief Judge.

The second appeal of this case presents the single question of whether the district court committed reversible error by dismissing the action following an earlier remand. We hold that the district court did not err, and accordingly, affirm.

**I.**

The background of the dispute involved in this case was set forth as follows in our earlier opinion:

In December 1975 Consolidated Rail Corporation (Conrail) entered into identical agreements with a number of connecting railroads including the plaintiffs Detroit, Toledo and Ironton Railroad Company (DTI) and Grand Trunk Western Railroad Company (GTW). DTI and GTW have since merged and will be referred to as DTI/GTW. In each of these agreements Conrail bound itself to file tariffs adopting all joint routes, joint rates and divisions published by the bankrupt railroads which it succeeded, to the extent that such joint rates and joint routes were participated in by the other party to the agreement. Further, both parties to each contract agreed "to maintain and keep open with respect to each other all routes and channels of trade via existing junctions and gateways, unless and until otherwise authorized by the Interstate Commerce Commission (Commission)."

The present controversy began when Conrail filed a rate tariff with the ICC on October 19, 1982, to be effective Novem-

ber 13, 1982. This rate tariff provided for cancellation of certain joint rates with other carriers arising out of the December 1975 agreements. The railroads other than DTI/GTW which were parties to the 1975 agreements, and several shippers, filed protests with the ICC and obtained a suspension of the tariff. Rather than following this course DTI/GTW filed this action in the district court seeking an injunction against cancellation of the joint rates.

*Detroit, Toledo & Ironton R.R. Co. v. Consolidated Rail Corp.*, 727 F.2d 1391, 1392 (6th Cir.1984).

The district court granted a temporary restraining order, followed by a preliminary injunction which required Conrail to eliminate from its previously filed tariff those provisions canceling joint rates with DTI/GTW. Conrail complied with this order by amending its tariff to eliminate those provisions which would cancel joint rates with DTI/GTW, and appealed the injunction. This court recognized that the real dispute was over routes rather than rates, since the effect of canceling the joint rates with DTI/GTW would be to make other routes more attractive to shippers. *Id.* at 1393. However, since joint rates and joint routes were inextricably related to each other, and Conrail had chosen the permissible approach of seeking approval of the Interstate Commerce Commission (hereafter ICC or Commission) for cancellation of the joint rates, primary jurisdiction over the dispute was in the Commission. We reversed the judgment of the district court and remanded with directions that the injunction be dissolved. *Id.* at 1399.

## II.

Shortly after the mandate was issued from this court, DTI/GTW filed a motion in the district court requesting that court to "refer certain questions to the ICC for its immediate determination, with instructions that the ICC report back to the Court forthwith." Conrail opposed this motion, pointing out that it had amended its previously-filed tariff and that there was no disputed tariff presently on file with the ICC with respect to rates and routes involving

DTI/GTW. Thus, it argued, upon dissolution of the preliminary injunction, there would be no active case or controversy before the district court involving these parties. DTI/GTW replied that a finding of primary jurisdiction in the Commission did not permanently deprive the district court of jurisdiction and that following action by the Commission it would be the duty of the district court to decide the legal issues presented by the case. While this motion was under consideration the district court complied with this court's direction and dissolved the injunction.

After considering the briefs of the parties the district court issued the following order:

This matter came before the court on plaintiffs' motion seeking immediate referral of questions to the Interstate Commerce Commission for determination and report. Defendant contends that plaintiffs' action should be dismissed, rather than referred to the I.C.C., because at this juncture there is no disputed tariff on file. We agree with defendant that at this point there is no case or controversy, because defendant has not yet filed a tariff that would attempt to foreclose any joint routes. If in the future, defendant should file such a tariff or tariffs, then it is clear from the Sixth Circuit decision in this case that plaintiffs should proceed before the I.C.C. *DT & I Ry. Co. v. Consolidated Rail*, No. 82-1890 (6th Cir. January 24, 1984).

Accordingly, IT IS ORDERED that plaintiffs' motion seeking immediate referral of questions to the I.C.C. for a determination and report be and the same hereby is DENIED;

IT IS FURTHER ORDERED that plaintiffs' complaint be and the same hereby is DISMISSED without prejudice since there is presently no disputed tariff on file for the I.C.C. to consider.

This appeal followed.

## III.

### A.

The main thrust of DTI/GTW's argument is that the district court erred in

treating this case as moot. It maintains there is an active case or controversy between the parties because of their longstanding dispute over whether Conrail can unilateraly cancel joint rates when the effect of that act is to close joint routes which Conrail agreed to keep open. DTI/GTW reasons that while the ICC has primary jurisdiction to deal with rates, the district court's deference to the Commission is limited to that function. The primary jurisdiction of the Commission is temporary and did not oust the district court of its underlying jurisdiction over the lawsuit for specific performance of the December 1975 contract. Thus, DTI/GTW argues, the district court should have stayed its hand and referred the rate-related issues to the ICC rather than dismissing the action. It contends that dismissal is proper only when an agency has exclusive jurisdiction over a dispute; when it merely has primary jurisdiction, the court should hold the case in abeyance until the agency acts, not dismiss it. Dismissal is always improper when it prejudices the plaintiff, DTI/GTW asserts.

DTI/GTW makes an additional argument which it did not present to the district court or to this court on the earlier appeal where the principal issues was one of jurisdiction. It argues now that with deregulation of the railroads the ICC has exempted many categories of freight from rate control by the Commission. Some of these categories are subject to the December 1975 contract, and as to these, the ICC does not have even "primary," much less exclusive jurisdiction. Since Conrail does not need Commission approval to cancel joint rates as to these items, only the court has jurisdiction to determine whether the cancellations violate the terms of the December 1975 contract. DTI/GTW contends that the district court therefore had issues before it solely within its jurisdiction and erred in dismissing the action without deciding them.

**B.**

Conrail contends that much of DTI/GTW's argument misconstrues the district court's action. While this court's finding that the Commission has primary jurisdiction over the issue raised by Conrail's filing of the tariff was the basis of the district court's order dissolving the injunction, that was not the basis for its order dismissing the action. Conrail argues that the latter order was based upon the fact that there was no tariff pending before the ICC which would have the effect of closing joint routes of the parties and thus there was no active case or controversy. This action was not brought by DTI/GTW to obtain a declaration of the rights of the parties under the December 1975 contract. Rather, it sought specific performance of that contract in a very particular way—by requiring Conrail to amend its 1982 notice of tariff canceling joint rates "so as to maintain and keep open each and every through route and joint rate with Plaintiffs." When the district court granted the injunction Conrail did amend its tariff filing and the purpose of this lawsuit was accomplished. Though the injunction has since been dissolved on order of this court, Conrail has filed no new or amended tariff which would affect its joint rates or joint routes with DTI/GTW.

Conrail further asserts that if it should file a new or amended tariff DTI/GTW can seek suspension of the rate action pending consideration by the Commission as well as a decision on the merits in accordance with well-defined statutory procedures. Thus, it contends, the district court did not abuse its discretion in dismissing the action without prejudice. Since the present case concerned only the 1982 tariff and that tariff has been amended by eliminating the cancellation of joint rates with DTI/GTW, the district court correctly concluded that nothing remained for decision at that time. The fact that there is an ongoing dispute between the parties concerning Conrail's right to cancel joint rates where the effect is to close joint routes does not mean that there was an active case or controversy before the court after the particular tariff sought to be enjoined in this action had been amended.

Conrail also takes issue with DTI/GTW's "exempt freight" argument. Exempt freight was never an issue in this case, it asserts. The ICC has been exempting categories of freight from rate regulation since 1979. The tariff which Conrail filed in 1982 concerned only regulated freight and the injunction which DTI/GTW sought and obtained only affected that tariff. In addition, Conrail maintains, if DTI/GTW intended to rely on the fact that some freight subject to regulation when the December 1975 contract was made and had since been deregulated, it should have presented this argument to the district court and to this court on its earlier appeal.

## IV.

The legal arguments of the parties have concerned two issues principally: (1) whether this case was moot when the district court dismissed it; and (2) whether dismissal is the proper action by a district court when it is determined that an administrative agency has primary jurisdiction over a dispute then pending in the court.

### A.

■■■ No good purpose would be served by a lengthly discourse on the law of mootness. The parties have cited, and we have examined a number of decisions which deal with mootness both in terms of Article III jurisdictional requirements and court-created jurisprudential grounds. *E.g., Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983) (an expression of the constitutional limitation of the federal courts to act); *Kirby v. United States Government*, 745 F.2d 204 (3d Cir.1984) (jurisprudential considerations). DTI/GTW argues that Conrail's amendment of its tariff did not render this case moot because mootness can not be created by the voluntary act of a party in discontinuing its challenged activities, while remaining free to "return to its old ways" after the threat of a lawsuit has passed. (Quoting *United States v. W.T. Grant*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). When a defendant

voluntarily ceases allegedly illegal activity, but continues to insist on the validity of its position, cessation does not render an existing court action moot. *Walling v. Helmerich & Payne*, 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944).

We think this argument overlooks one of the significant facts in this case. Until the ICC acts, there is nothing for a court to decide. This is true, not only because the ICC has primary jurisdiction as a matter of law over the rate-related issue, but more significantly because the parties have agreed that the contract which DTI/GTW seeks to have enforced places the decision as to its continuance squarely before the Commission. The parties agreed in the December 1975 contract "to maintain and keep open with respect to each other all routes and channels of trade via existing junctions and gateways, *unless and until otherwise authorized by the Interstate Commerce Commission (Commission)*." (Emphasis added). Having agreed that the continuance of the contractual arrangements was subject to the authority of the ICC, the parties were bound to present any dispute over proposed changes to that agency. Even if the rate-related feature of the joint route dispute had not required resort first to the Commission under the doctrine of primary jurisdiction, the contract itself imposed that obligation. The fact that Conrail may again seek to cancel joint rates with DTI/GTW by filing a new or amended tariff with the Commission would not be a "return to its old ways" in the sense of doing something unlawful. Rather, it would be seeking relief from terms of the contract in the very manner contemplated by the parties and before the very tribunal designated in the contract as the one empowered to authorize the changes it desires. DTI/GTW emphasized in the first appeal that this case is really about through routes, not joint rates. Yet the contract dealt with both joint rates and joint routes and also with the power to authorize changes in the joint route provisions. This power was vested by the contracting parties in the ICC, not in the court.

This is not a simple action on a contract as claimed by DTI/GTW. It is unusual in at least two respects: (1) it involves railroad freight rates which were totally regulated by the ICC when the contract was made; and (2) the contract deals specifically with the issue in dispute and provides that the ICC is authorized to change the existing arrangements. Under these circumstances, whether or not the case before it was technically moot by reason of a change in circumstances, it was clear to the district judge that there was nothing before him for decision. The district court was foreclosed from deciding this case, not because of voluntary cessation of unlawful activity by Conrail, but rather by the primary jurisdiction of the ICC and by the very terms of the contract which DTI/GTW was seeking to have the court enforce.

■■■ A case may be dismissed on jurisprudential considerations if the court has no present ability to provide a meaningful remedy. In making this decision a court should determine whether it has the ability to provide *any* effective remedy, not just the remedy demanded by the plaintiff in its pleadings. Rule 54(c), Fed.R.Civ.P.; *Kirby v. United States Government*, 745 F.2d 204, 207 (3d Cir.1984). Given the limitations imposed by the contract, the only relief available from a court in this case would have been a declaration of the rights of the parties under the contract. However, the "case or controversy" requirement applies to declaratory judgment actions as well as to other cases of a more conventional nature. *Golden v. Zwicker*, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969). The test for determining whether such a controversy exists in a declaratory judgment action was stated by the Court as follows:

> "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 [61 S.Ct. 510, 512] (1941).

*Id.*

Given the fact that nothing was pending before the ICC and that the parties had agreed that the ICC was the agency empowered to authorize changes in the existing contractual arrangements, we conclude that the controversy between the parties was not of "sufficient immediacy and realty to warrant the issuance of a declaratory judgment." *Ibid.*

**B.**

■■■ DTI/GTW argues that the only permissible course for a court to follow in a case where primary but not exclusive jurisdiction is vested in an agency is to stay its hand, not to dismiss the action. The Supreme Court has approved both courses of action. In *Far East Conference v. United States*, 342 U.S. 570, 576–77, 72 S.Ct. 492, 495–96, 96 L.Ed. 576 (1952), the Court wrote that a district court has the option of ordering a case retained on its docket pending agency action or ordering dismissal. It noted a distinction between cases on a contract and "raising only incidentally a question proper for initial administrative decision" and those involving questions within the general scope of the agency's jurisdiction. *Id.* at 577, 72 S.Ct. at 495. When questions of the latter type are involved, the agency decision is subject to review by a court of appeals, with the opportunity for further review in the Supreme Court by certiorari. The Court found no purpose to be served by holding such an action in abeyance in a district court while the agency proceedings were completed and the review processes were exhausted. "A similar suit is easily initiated later, if appropriate." *Id.*

More recently the Supreme Court suggested that the course to follow might turn on whether a party would be prejudiced by a dismissal of the case. In *United States v. Michigan National Corp.*, 419 U.S. 1, 95 S.Ct. 10, 42 L.Ed.2d 1 (1974), the Supreme Court compared a district court's action

when it has a case where primary jurisdiction is in an administrative agency with abstention under *Railroad Commission v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In *Pullman* abstention cases, "the common practice has been for the district court to retain jurisdiction but to stay proceedings while awaiting a decision in the state court." *Michigan National Corp.*, 419 U.S. at 4, 95 S.Ct. at 11 (citations omitted). The Court then declared:

> The same procedure has generally been followed when the resolution of a claim cognizable in a federal court must await a determination by an administrative agency having primary jurisdiction. See *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 222–224 [86 S.Ct. 781, 787–88, 15 L.Ed.2d 709] (1966); *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 432–433 [60 S.Ct. 325, 331, 84 L.Ed. 361] (1940); *Mitchell Coal Co. v. Pennsylvania R. Co.*, 230 U.S. 247 [33 S.Ct. 916, 57 L.Ed. 1472] (1913). Dismissal rather than a stay has been approved where there is assurance that no party is prejudiced thereby.[2] See *Far East Conference v. United States*, 342 U.S. 570 [72 S.Ct. 492, 96 L.Ed. 576](1952).

> [2] We may put to one side cases where the administrative agency has exclusive jurisdiction to consider the complaint initially brought in court, *e.g., Pan American World Airways v. United States*, 371 U.S. 296 [83 S.Ct. 476, 9 L.Ed.2d 325] (1963), or those in which Congress, by depriving the agency of a remedy, is deemed to have withheld it from the courts as well, *e.g., Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 [71 S.Ct. 692, 95 L.Ed. 912] (1951). In such cases, the court must of course dismiss the action.

*Id.* at 4–5, 95 S.Ct. at 12.

The present case appears to be of the type where dismissal is permitted. The central issue both as a matter of law and by the agreement of the parties is one which is within the authority of the ICC. It is not just an incidental issue in a breach of contract action. Furthermore, dismissal did not prejudice DTI/GTW despite its very general claims to the contrary. There was nothing pending before the Commission for which the court could have stayed its hand at the time DTI/GTW requested that course of action, and the joint routes and joint rates continued in effect. The motion for the court to "refer certain questions to the ICC" was meaningless. The parties agreed that the terms of the contract were binding until the Commission authorizes a change. If Conrail again seeks ICC approval of a tariff which will result in closure of through routes, DTI/GTW may seek a suspension pursuant to 49 U.S.C. § 10707, and if the ICC approves the tariff, that decision is subject to review. See *Chesapeake and Ohio Ry. Co. v. United States*, 704 F.2d 373 (7th Cir.1983), where a decision of the ICC approving a tariff which canceled joint rates between Conrail and other railroads was vacated upon a finding that the decision was not supported by substantial evidence.

### C.

The arguments concerning exempt freight are not before us. If DTI/GTW believes it has a claim that joint routes cannot be closed to exempt freight under the December 1975 contract, that claim should be clearly presented in another action. It never relied on this argument in its pleadings in the district court or in its briefs and arguments on the first appeal to this court and it will not be prejudiced in any way by presenting such a claim in a new action. The dismissal by the district court was without prejudice, and DTI/GTW has failed to identify any actual prejudice arising therefrom.

### V.

Frequently a court must decide how a thing may be done, not whether it can be done. In this case DTI/GTW has sought assiduously to avoid presenting its arguments to the ICC. As we pointed out in our first opinion, all the other railroads who were affected by Conrail's 1982 tariff filed protests with the ICC and litigated the matter there. Only DTI/GTW followed the course of seeking to enjoin Conrail. Even after this court held that the ICC had primary jurisdiction over the dispute, DTI/GTW did not present the issue to the

Commission. Instead, it requested the district court to refer "certain questions," not otherwise identified, to the Commission with instructions to report back to the court forthwith. This appears to be a continuing effort to avoid submitting to the ICC the issue it was empowered by the contract to decide—whether it would authorize a departure from the agreement "to maintain and keep open with respect to each other all routes and channels of trade via existing junctions and gateways."

In *Changes in Routing Provisions-Conrail-July 1981*, 365 I.C.C. 753 (1982), the Commission found in the December 1975 contracts with other carriers no impediment to approval of Conrail's cancellation tariff. The Seventh Circuit agreed with this determination, commenting that it was not only hard to believe that Conrail signed contracts of perpetual duration, but that the position of the other carriers was "contrary to contract language binding the parties to maintain the joint rates 'unless and until otherwise authorized by the Commission.'" The court then observed, "[t]he Commission's decision is that authorization." *Chesapeake and Ohio Ry. Co. v. United States*, 704 F.2d at 375.

The judgment of the district court is affirmed.